**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Donald J. Tate, | No. CV-12-0789-TUC-BGM |
| Plaintiff, | |
| vs. | **ORDER** |
| Carolyn W. Colvin,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 31).  Defendant filed her response (Doc. 37), and no reply was filed.  Also pending is Plaintiff's Motion for Substitution of Party (Plaintiff) filed with his Opening Brief (Doc. 32).  Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).  The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.      BACKGROUND**

*A.      Procedural History*

On September 9, 2009, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of September 30, 2008 due to failed back syndrome with history of back fusion with chronic back pain; lumbar degenerative disc disease; hypertension; trochanteric bursitis; gastroesophageal reflux disease; insomnia;

neuropathic pain; sedative dependency; benzodiazepine dependence; opiate dependence; cannabis dependence; bipolar disorder; panic disorder; anxiety disorder; manic depressive disorder; and depression.[1]  *See* Administrative Record ("AR") at 11, 13-14, 97, 100, 112, 116, 151, 236, 240, 328.  The Social Security Administration ("SSA") denied this application on February 10, 2010.  *Id.* at 101.  On March 15, 2010, Plaintiff filed a request for reconsideration, and on April 14, 2010, SSA denied Plaintiff's request.  *Id.* at 109-16.  On June 15, 2010, Plaintiff filed his request for hearing.  *Id.* at 117-18.  On April 21, 2011, a hearing was held before Administrative Law Judge ("ALJ") Tammy Whitaker.  *Id.* at 40.  The ALJ issued an unfavorable decision on July 28, 2011.  AR at 8-25.  Plaintiff requested review of the ALJ's decision by the Appeals Council, and on August 29, 2012, review was denied.  *Id.* at 1-7.  On October 26, 2012, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.    *Factual History*

Plaintiff was thirty-three (33) years old at the time of the administrative hearing, and thirty (30) at the time of the alleged onset of his disability.  AR at 40, 44, 191, 216, 236, 284, 295, 328.  Plaintiff possesses a Bachelor's degree in secondary education.  *Id.* at 44, 202.  Prior to his alleged disability, Plaintiff worked as a secondary school teacher.[2]  *Id.* at 80, 161-71, 196, 205-15, 241.  More recently, Plaintiff has worked for short periods of time in fast food, doing landscaping design and as a landscaper, and running a daycare program.  *Id.* at 45-50, 172-90.

At the administrative hearing, Plaintiff testified that he currently lives with his parents.

---

[1]On February 11, 2008, Plaintiff filed for DIB benefits, with an alleged onset date of February 5, 2008.  AR at 191, 216.  This application alleged "[d]egenerative disc disorder/disease of the spine[.]" *Id.* at 195.  At the administrative hearing, Plaintiff testified that he had "made two applications [for disability], it was denied twice[.]" *Id.* at 48.

[2]Prior to his work as a teacher, Plaintiff worked as a substitute teacher and a case manager for both a state agency, as well as a non-profit agency.  AR at 196, 205-15, 227-28, 241.

1   *Id.* at 50. Plaintiff further testified that he has one child, who lives with her mother. AR at

2   51. Plaintiff testified that he drives an automobile perhaps once or twice a week, but

3   generally his mother or brother drive him. *Id.* at 44.

4       Plaintiff testified that while receiving unemployment benefits in September 2008, he

5   continuously looked for work. *Id.* at 48-49. Plaintiff further testified that he "signed up with

6   Goodwill to do some vocational rehab to try and help [find a job]." *Id.* at 48. Plaintiff also

7   testified that he spent approximately thirty (30) to forty (40) hours per week looking for

8   work, either on the internet, in the newspapers, or "go[ing] out and hit[ting] the pavement."

9   *Id.* at 48-49.

10       Plaintiff described his typical day upon waking as "do[ing] physical therapy where

11   it involves zero [sic] gravity table so that I can stretch my spine . . . for about 25 minutes to

12   45 minutes . . . and I walk and I have a medicine ball where I use it to stretch out and that's

13   usually about another 30 minutes exercise." AR at 51-52. Plaintiff later stated that his zero

14   gravity table was broken, and that he would like to get another, because "they worked out

15   great." *Id.* at 64. Plaintiff further testified that he then tries "to strengthen [his] back and

16   build a type of repetitive motion to where [he] can rebuild the strength in [his] back." *Id.* at

17   52. Plaintiff testified that he spends approximately three (3) hours per day exercising. *Id.*

18   In the afternoon, Plaintiff testified that some days he has to "lay down because the pain's so

19   bad, then some days . . . [he will] try and walk, some days [he will] take the dog for a walk."

20   *Id.* Plaintiff further testified that normally he is "unable to walk more than you know 20

21   minutes at a time or 15 minutes at a time." AR at 64. Plaintiff also testified that during the

22   afternoon he will sit "elevating [his] feet" and read. *Id.* at 53. In the evenings, Plaintiff

23   testified that he will sit or lay down "in and out of a daze[.]" *Id.* at 54. Plaintiff further

24   estimated that he spends "four and a half to six hours" on a computer each night. *Id.* at 54-

25   55. During this time, Plaintiff testified that he will look for work, look for new back

26   exercises and other new therapies for his back, and download books to his Kindle. *Id.* at 55,

27   64. Plaintiff estimated that he gets approximately four (4) to six (6) hours of sleep per night.

28

1    AR at 54.

2        Plaintiff testified that he talks on the telephone "maybe three or four hours a week if

3    that[,]" and "a lot of times it's just talking to my mom." *Id.* at 55.  Plaintiff further testified

4    that he does not watch television.  *Id.*  Plaintiff testified that he needs help with putting on

5    his socks and shoes, and sometimes with "washing the lower part of [his] back and [his] legs

6    and [his] feet because [he] can't reach those areas or [he is] hurting in those areas[.]" *Id.* at

7    56; *see also* AR at 262.  Plaintiff's wife also documented that he needs assistance with his

8    socks and shoes.  AR at 250.  Plaintiff further testified that he has added bars next to the

9    toilet in the bathroom to help him stand up.  *Id.* at 56.  Plaintiff's wife confirmed that he

10   "occasionally needs help getting up" from the toilet.  *Id.* at 250.  Plaintiff also testified that

11   he has not cooked in "probably eight months[.]" *Id.* at 57; *see also* AR at 263.  Plaintiff's

12   wife noted that he does not do much cooking anymore.  AR at 251.

13       Plaintiff testified that he has "just started with this healthy living changers group[.]"

14   *Id.* at 57.  Plaintiff further testified that he has "[m]aybe three" people that he regards as

15   friends.  *Id.* at 58.  Aside from his spouse, Jennifer, he sees his other friends "[m]aybe once

16   every three weeks, four weeks[.]" *Id.*  Plaintiff testified that when he sees his friends "[n]ine

17   times out of ten I may watch a football game, this, that or another or I'll just try and avoid

18   them."  *Id.*  Plaintiff stated that "I feel like because of the medication I'm on that that's the

19   only reason they want to interact with me . . . I feel like they just use me."  AR at 58.

20       Plaintiff testified that prior to September 2008 he enjoyed golfing.  *Id.* at 59.

21   Plaintiff further testified that he has ridden a bicycle perhaps once or twice in 2011, as of the

22   time of the hearing.  *Id.* at 60.  Plaintiff testified that in 2010 he rode his bicycle

23   approximately three (3) times per month, depending upon how much pain he was in.  *Id.* at

24   61.  Plaintiff further testified that he walks "as a form of exercise or activity[.]" *Id.*  Plaintiff

25   testified that he tries to walk to the mailbox.  *Id.* at 62.

26       Plaintiff testified that he traveled to Indianapolis from Arizona for the hearing.  AR

27   at 63.  Plaintiff further testified that "it hurt quite a bit to sit . . . for six hours but the flight

28                                              - 4 -

attendants were very accommodating in the sense that they let me get up and move around." *Id.* Plaintiff further testified that he is a "people person" who gets along well with others. *Id.* at 64.

Plaintiff testified that he has pain in his lower back, legs and side of his rib cage. *Id.* at 65. Plaintiff further testified that the pain is constant. *Id.* Plaintiff testified that "[m]oving around, [and] doing simple functioning chores around the house" increases his pain. AR at 66. Plaintiff testified that he sweeps the floor and does his own laundry. *Id.* at 66. Plaintiff further testified that he tries to walk to make his physical pain feel better. *Id.* Plaintiff testified that he takes pain medication, and the morning of the hearing took 30 milligrams of morphine, 20 milligrams of Percocet, 500 milligrams of Naproxen, Lisinopril for his blood pressure, 30 milligrams of Valium, and 10 milligrams of diazepam. *Id.* at 66-68. Plaintiff also testified that he takes Zantac. *Id.* at 68. Plaintiff testified that he had been on other medications, but they were discontinued because they affected his ability to function. AR at 69. Plaintiff further testified that he does not sleep during the day, and he does not experience fatigue as severely as when he was taking the previous medications. *Id.* Plaintiff testified that he did not sleep very well the previous night due to the quality of the mattress, and that he is tired due to travel. *Id.* at 69-70. Plaintiff further testified that his pain medication eliminates his pain for approximately three (3) to five (5) hours; however, it starts to increase. *Id.* at 70-71. When the pain returns it is at between six (6) and eight (8) on a scale of one to ten, with ten being the most severe. *Id.* at 72.

Plaintiff testified that he can sit for five (5) to ten (10) minutes at one time, walk for five (5) to ten (10) minutes, and stand for maybe fifteen (15) to twenty (20) minutes. AR at 72. Plaintiff further testified that he can not lift much at all, and "no more than 20 pounds." *Id.* Plaintiff testified that he is right-hand dominant, and does not have any problems with either his right or left arm and shoulder. *Id.* at 73. Plaintiff testified that he has not "taken any medications for mental impairments since 2008[.]" *Id.* Plaintiff testified that this is a result of his not being insured. *Id.* Plaintiff also stated that the three medicines he stopped

taking because of the side effects were obtained through the Arizona Health Care Cost Containment System ("AHCCCS"), his testimony seems to indicate that these medicines were for mental health issues. AR at 73-74, 76-77. Plaintiff testified that to the best of his recollection he last used marijuana in January 2008. *Id.* at 74. Plaintiff further testified that he last used cocaine in January 2009. *Id.* at 75.

Plaintiff testified that a doctor prescribed the cane that he was using. *Id.* at 77-78. Plaintiff further testified that he had originally been prescribed a walker, and that he had eventually stopped using it.[3] *Id.* at 78. Then, in April 2009, Plaintiff started using the cane "all the time." AR at 78. Plaintiff testified that he uses it "[b]ecause my left leg gives out on men and when it gives out on me . . . I lose the ability to function in my left leg." *Id.* at 78-79. Plaintiff further testified that he has fallen as a result. *Id.* at 79. Plaintiff also testified that his left foot is "floppy" a lot of times, which causes him to stumble and fall. *Id.* at 79-80.

Ms. Constance Brown, a Certified Rehabilitation Counselor, also testified at the administrative hearing. *Id.* at 80. Ms. Brown testified that she classified Plaintiff's previous employment as a secondary school teacher as light skilled work with a specific vocational preparation ("SVP") of seven (7). AR at 80. Ms. Brown further testified that this classification was based on how Plaintiff appeared to perform the job, and the Dictionary of Occupational Titles ("DOT") number was 091.227-010. *Id.* Ms. Brown testified that prior to being a teacher, Plaintiff worked as a substitute teacher. *Id.* at 80. Because he had not been trained as a teacher at that time, Ms. Brown classified the position as a teacher aide I. *Id.* Ms. Brown further testified that the DOT number is 099.227-042, and it is light, skilled work, with an SVP of 6. *Id.* at 81. Ms. Brown further testified regarding the classification of Plaintiff's work as a case manager for a state agency, stating the DOT number is 195.107-

---

[3]Plaintiff's wife confirms this testimony. AR at 255. Although she was unsure of when the assistive devices were prescribed, she noted that it occurred after Plaintiff's last surgery. *Id.*

018. AR at 81. Ms. Brown testified that this is sedentary work, skilled with an SVP of 7, which appeared to be how Plaintiff performed the job. *Id.* Ms. Brown testified that Plaintiff also worked as a case manager for a non-profit agency, which she classifed as DOT number 195.107-018, sedentary, skilled work with an SVP of 7, which appeared to be how the job was performed. *Id.* at 81. Ms. Brown further testified that Plaintiff's work as a supervisor for a daycare program, would be listed as DOT number 168.167-010, light skilled work with an SVP of 8. *Id.* Ms. Brown testified that Plaintiff's work as a landscaper and landscape designer was categorized as DOT number 408.161-010, heavy, skilled work with an SVP of 7. *Id.* 81-82. Ms. Brown also classified Plaintiff's work as a landscape laborer, DOT number 408.687-014, heavy, unskilled work with an SVP of 2. AR at 82.

The ALJ's asked the following hypothetical

> [I]f there was a younger person with a high school and above education and they had past relevant work that you described for this particular individual but not the landscaper job. And that person had a residual functional capacity such that they could perform work at the sedentary exertion level. They would however never be able to operate foot controls, they could never climb ladders, ropes, scaffolds or stairs. They could occasionally climb ramps, they could do occasional balancing, occasional stooping but never repetitively below the waist. The person could do occasional crouching, never any kneeling or crawling, the person can never do overhead reaching, environmentally the person would need to avoid all exposure to unprotected heights, dangerous machinery or slippery or uneven walking surfaces. The person would also need to never perform driving of automotive equipment commercially. The person also would need work limited to simple, routine and repetitive tasks, the person would need work that would allow them to be off task 10 percent of the day and work where they would have no interaction with the public. And could that person in your opinion perform any of this past work as you've described it for this claimant?

*Id.* at 82-83. Ms. Brown opined that no, such an individual could not perform Claimant's past relevant work. *Id.* at 83. Ms. Brown further opined that there was other work in the national economy that such an individual could perform. *Id.* Such positions would be sedentary and unskilled. *Id.* Ms. Brown testified that categories such as "general office clerks, the DOT, a sample DOT number which is 209.587-010, . . . [and] bookkeeping and audit clerks, a sample DOT number of which is 219.587-010." AR at 83. Ms. Brown further testified that semiconductor assembly jobs, DOT number 726.687-030 would also be

available to such an individual.  *Id.* at 84.

The ALJ then added to her hypothetical that "the person also needed the ability to sit or stand alternatively but could only sit, stand or walk each 30 minutes at one time and they would need to utilize an assistive device such as a cane when ambulating.  *Id.*  Ms. Brown testified that such a person could not do the assembly job, but could perform the general office clerk and audit clerk jobs.  *Id.*  Ms. Brown further testified that there were no other jobs available to such an individual.  *Id.*  The ALJ further added to her hypothetical that the individual could only have occasional interaction with coworkers.  AR at 84.  Ms. Brown testified that such a person could still perform the general office clerk and audit clerk jobs.  *Id.* at 85.

The ALJ defined off task to mean "that the person's in the work environment either at their duty station or away from their duty station no performing their assigned duties for any reason . . . [and] that from a vocational perspective that it's not so much important why you're off task but rather the amount of time you're off task[.]" *Id.* at 85-86.  Ms. Brown concurred with this definition.  *Id.*  The ALJ further modified her hypothetical to change the ten (10) percent off task time to fifteen (15) percent of the day in addition to regularly scheduled breaks.  *Id.* at 86.  Ms. Brown testified that this change would eliminate the semiconductor assembly, and "[i]t would be at the outside margin for the clerical jobs."  AR at 86.  Ms. Brown further explained that an individual could not consistently be off task fifteen (15) percent of the day and still perform those jobs.  *Id.* at 86-87.  The ALJ asked Ms. Brown whether her opinions were consistent with the DOT, and Ms. Brown confirmed, stating "[i]n so far as the <u>Dictionary</u> covers my testimony, Judge, they are consistent.  *Id.* at 85.

The ALJ noted that "[b]ased upon my observations of the claimant's demeanor evidence today during which I will note among other things while Ms. Brown was testifying the claimant's eyes were closed often and also during his testimony." *Id.* at 87.  Plaintiff consistently testified that he was not suffering from fatigue due to his medications or

otherwise impaired; however, he apparently fell asleep during his testimony. *Id.* at 62-63, 69-70, 75, 77, 87.

On October 23, 2004, Plaintiff was seen in the emergency room of Community Hospitals Indianapolis for "left upper quadrant abdominal pain." AR at 643. Plaintiff complained of multiple vomiting and diarrhea episodes that morning. *Id.* Plaintiff was given Morphine, Phenergan, and Reglan intravenously. *Id.* at 644. This resulted in complete relief of his pain. *Id.* Plaintiff was given prescriptions for Phenergan and Lortab on discharge. *Id.* at 645-46. On December 13, 2004, Plaintiff was seen at Midtown Community Health Center for bipolar mania and needing medication. AR at 799-800. Plaintiff had been fired from his previous psychiatrist for "not paying bill and arguing with MD about MD not seeing him in a timely manner." *Id.* at 799. Plaintiff denied past suicide attempts and alcohol or drug use. *Id.* Plaintiff was scheduled to go to court the following day for a violation of a restraining order filed by his wife. *Id.* Plaintiff was given Seroquel 100 mg. *Id.* On December 29, 2004, Plaintiff returned to Midtown Community Mental Health Center for a follow-up. AR at 801. Plaintiff reported that he "was seen initially seen [sic] on 12/14/04 and was given Seroquel 100mg 5-6 pills daily." *Id.* Plaintiff reported that "he was given 60 pills and he is down to one pill." *Id.* Plaintiff's medication was renewed until he can be seen at his regular appointment. *Id.* at 802.

On January 18, 2005, Plaintiff was seen at Midtown Community Mental Health Center for an initial assessment. *Id.* at 803-05. Plaintiff spoke with "restless, entitled demeanor" and had a "dysphoric mood[.]" AR at 803. Plaintiff also mentioned that he is changing primary care physicians and taking Gabapentin. *Id.*

On May 31, 2007, Plaintiff filled out a Medical Illness Profile listing two previous back surgeries. *Id.* at 354. In July 1997, Plaintiff underwent an L5 microdiscectomy, and in January 2003 a L4-L5-S1 microdiscectomy. *Id.* The only medication Plaintiff listed was 2400 milligrams of ibuprofen daily. *Id.* On June 14, 2007, Plaintiff underwent a magnetic resonance imaging ("MRI"). AR at 538-39. The MRI indicated normal disc heights and

hydration, with intact central canal and normal nerve root canal at the L3-4, L2-3, and L1-2 levels. *Id.* At L5-S1, the study indicated a "broad-based recurrent disc protrusion and prominent annular flap on the left . . . exerting mild displacement of the left S1 nerve root, without progression since the previous study." *Id.* at 539. Kent B. Remley, M.D., the interpreting physician, further concluded that "[n]o recurrent disc extrusion or nerve root compression [was] identified[,] [and] [t]here [was] persistent moderate disc degeneration on the left." *Id.* Dr. Remley also noted "[p]rogressive disc degeneration L4-5 with new shallow broad-based right paracentral disc herniation. No stenosis or nerve root impingement [was] identified at this level." *Id.* On June 27, 2007, Plaintiff underwent a discogram at the L2-L3, L3-L4, L4-L5, and L5-S1 levels. AR at 699. The objective findings reported "[d]egenerative disks with normal bony anatomy of the spine." *Id.*

On August 21, 2007, Plaintiff was seen by James P. Caughlin, M.D. regarding hypertension and nicotine dependence. *Id.* at 729-30. Plaintiff reported "[f]eeling fine[.]" *Id.* at 729. Plaintiff was started on Lisinopril for his high blood pressure and Chantix for his nicotine dependence. *Id.* at 730.

On October 4, 2007, Plaintiff underwent a MRI of his lumbar spine with and without contrast. AR at 355, 543, 545. This was a comparison study to a previous MRI performed on June 14, 2007. *Id.* At L5-S1 the study reports "mild to moderate dehydration[,] . . . a laminotomy defect is present on the left[,] [t]here is broad-based residual disc herniation extending to the left with a prominent annular flag that contacts the left S1 nerve root with some persistent displacement although no frank compression is identified." *Id.* at 355, 543. Further "[t]here is moderate narrowing of the left neural foramen without frank dorsal root ganglion compression[,] [and] [t]he facet joints are stable." *Id.* At L4-L5 the study noted "[m]ild to moderate dehydration of the disc[,] . . . and a shallow broad-based central and right-sided protrusion containing a prominent high intensity zone that is stable in appearance." *Id.* There was "no definite nerve root compression[,]" the central canal was stable, the neural foramina adequate, and the facet joints intact. AR at 355, 543. No

1  abnormalities were identified at the L3-4, L2-3, and L1-2 levels. *Id.* "Overall, the current

2  study [was] nearly identical to the prior study of June 14, 2007. *Id.* at 355, 545. There

3  [were] no new findings to account for the patient's acute pain syndrome." *Id.* at 356. On

4  October 5, 2007, Plaintiff was seen by John N. Lomas, M.D. for L5 lumbar radiculopathy.

5  *Id.* at 695. Dr. Lomas performed a discogram at the L2-L3, L3-L4, L4-L5, and L5-S1 levels.

6  AR at 696. On October 17, 2007, Plaintiff filled out a medical history and assessment,

7  noting his two previous back surgeries, listing Lortab, Methadone, Valium, and Percocet as

8  current medications. *Id.* at 353. On the same date, Dr. Lomas performed a left L5-S1

9  transforaminal epidural steroid injection under fluoroscopy without complication. *Id.* at 710.

10  On January 7, 2008, Plaintiff was seen by Dr. Lomas, who diagnosed degenerative

11  disk disease. *Id.* at 359. On January 16, 2008, Dr. Lomas saw Plaintiff and performed a

12  Discogram at the L3-L4, L4-L5, and L5-S1 levels. *Id.* at 336-51, 403-04, 515-16. "This

13  [was] the second discogram that was done for [Plaintiff.]" AR at 337, 404. This same date,

14  a MRI was performed post discogram. *Id.* at 374-75, 488-89, 540-41. The MRI report

15  indicates that the foramen at each level are patent and without significant central stenosis.[4]

16  *Id.* On January 30, 2008, Plaintiff was seen by James K. Cole, M.D. for back pain. *Id.* at

17  518-19, 547-48. Plaintiff complained "primarily of back pain more than leg pain." *Id.* at

18  518, 547. Dr. Cole noted a "[n]ormal reciprocal gait pattern[,] [and] [l]umbar range of

19  motion is slightly decreased on forward bending." AR at 518, 547. Further, Plaintiff was

20  "nontender to palpation over the  thoracolumbar spine and nontender over the [posterior

21  sacroiliac spine,] PSIS[,] and [sacroiliac,] SI[,] joints." *Id.* Dr. Cole also noted that Plaintiff

22  had "normal strength to manual muscle testing in the bilateral lower extremities." *Id.* Dr.

23  Cole's assessment indicates degenerative lumbar disc disease at L4, L5, and S1, with

24  extensive conservative treatment status post L5/S1 discectomy. *Id.* Dr. Cole further noted

25

26

27  [4]At L5-S1, Mary E. Below, M.D. does not state that the foramen is "patent," but opines that she is "not convinced there is any significant bony foraminal narrowing." AR at 375, 489, 541.

28

1    Plaintiff's positive discogram at L4/5 and L5/S1, showing radial tears.  *Id.*  Accordingly, Dr.

2    Cole recommended an interbody fusion at L4, 5, and S1.  AR at 519, 548.

3         On February 8, 2008, Plaintiff was seen by Dr. Cole, and preoperative posteroanterior

4    and lateral chest x-rays were taken, an electrocardiogram ("ECG") was performed, and blood

5    work analyzed.  *Id.* at 363-73, 415-17, 434, 436-38, 467, 470-71, 477-86, 546, 705, 711.  The

6    x-rays showed "[n]o acute cardiopulmonary process."  *Id.* at 363, 371, 415, 438, 467, 477,

7    485, 642, 705.  Plaintiff's blood work indicated high glucose, mean cell hemoglobin, mean

8    cell hemoglobin concentration, and mean platelet volume.  *Id.* at 364-65, 369, 372, 436-37,

9    478-79, 483, 486.  Plaintiff's ECG indicated "[n]ormal sinus rhythm with sinus arrhythmia."

10   *Id.* at 368, 416-17, 434, 470-71, 482, 546, 711.  On February 12, 2008, Dr. Cole performed

11   a "[t]ransforaminal inner body fusion L4-5, posterolateral fusion of L4-5, instrumentation

12   L4-5, harvest of local autologous bone graft to L4-5, left L4-5 facetectomy and

13   transforaminal lumbar inner body fusion L5-S1, left L5-S1 facetectomy, decompression of

14   cauda equina and take down of bony osteophytes to decompress the cauda equina L5-S1

15   posterolateral fusion of L5-S1, pedicle instrumentation of L4-5, S1, local autologous bone

16   graft harvest L5-S1 and taken down of prior scar tissue."  AR at 377, 384, 388, 392, 419,

17   439, 452, 490, 497-98, 501, 505, 631, 697.  During the procedure an electromyogram

18   ("EMG") was recorded.  *Id.* at 396-400, 508-12.  Plaintiff was discharged on February 14,

19   2008, with Dr. Cole reporting that Plaintiff had done well post-operatively.  *Id.* at 380, 382,

20   390, 422, 435, 455, 493, 503, 634, 690.  Dr. Cole prescribed methadone, Percocet, and

21   Ambien on discharge.  *Id.*

22        Pursuant to a request by the Commissioner, Ziad Jaradat, M.D. examined Plaintiff on

23   April 14, 2008.  *Id.* at 525-28.  Plaintiff reported that he has "severe low back pain[,] . . .

24   [which] is worsened with bending, sitting, and standing, sleeping and laying down."  AR at

25   525.  Plaintiff further reported a "decreased [range of motion ("ROM")] in his back and that

26   the pain radiates down into his legs."  *Id.*  Plaintiff stated that he had "numbness and tingling

27   in both legs, more on the left with weakness in the left leg."  *Id.*  Plaintiff reported using his

28                                          - 12 -

cane for approximately nine (9) months, and that he could sit for approximately five (5) minutes without severe pain and stand briefly. *Id.* Plaintiff used Methadone and Percocet to control his pain. *Id.* Dr. Jaradat noted that Plaintiff was "in no apparent distress[,]" but had "difficulty getting out of a chair or on and off the examination table." AR at 526. Dr. Jaradat found that Plaintiff had a "[w]ide based gait and slow" and that although he "could ambulate a few feet without assistive measures[,] . . . the cane was medically necessary to prevent falls and maintain balance." *Id.* at 527. Dr. Jaradat further stated that Plaintiff was "not able to walk on his heels, toes, tandem walk or squat." *Id.* "All joints were with full range of motion without evidence of deformity, effusion, or inflammation with the exception of lumbar forward flexion was 40 degrees, extension, 0 degrees lateral flexion, 20 degrees on the right and 18 degrees on the left." *Id.* Dr. Jaradat assessed that Plaintiff has "normal muscle tone with no evidence of atrophy or spasm, must strength 4/5 in the left proximal lower extremity and 3/5 in the left distal extremity and 4+/5 in the right lower extremity." *Id.* Dr. Jaradat also found that Plaintiff had "[s]ymmetric deep tendon reflexes throughout at 0[,] . . . [and] [s]ensation to light touch was impaired in the left lower extremity." AR at 527. On April 18, 2008, Plaintiff's medical records were also reviewed by M. Brill, M.D. and a Physical Residual Functional Capacity Assessment completed based upon that review. *Id.* at 529-36. Dr. Brill determined that Plaintiff could occasionally lift twenty (20) pounds and frequently lift ten (10) pounds. *Id.* at 530. Dr. Brill further determined that Plaintiff could stand and/or walk (with normal breaks) for a total of about six (6) hours in an eight (8) hour workday, as well as sit for about six (6) hours in an eight (8) hour workday. *Id.* Dr. Brill found Plaintiff unlimited, other than the limitations on lifting and/or carrying, in his ability to push and /or pull (including operation of hand and/or foot controls). *Id.* Dr. Brill found Plaintiff could never climb ladders, ropes or scaffolds, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. *Id.* at 531. Dr. Brill determined that Plaintiff had no limitations on manipulation, vision, communication or environment. AR at 532-33.

On June 26, 2008, Plaintiff underwent a nerve study for "numb left digits 1, 2, and 3[,] [and] pain in both hands." *Id.* at 542, 544, 691.  Dr. Lomas found "mild right and moderate left median neuropathy at the wrists (carpal tunnel syndrome)." *Id.* at 544, 692.  "No evidence was found for concomitant right or left ulnar neuropathy[] [or] . . . cervical radiculopathy. *Id.*

On July 17, 2008, Plaintiff was seen at Clarian Health Partners for a Rheumatology consultation by Ellen Stoesz, M.D. *Id.* at 537, 662-63, 693-94.  Plaintiff had "developed hurting and swelling and morning stiffness in his hands starting in early May." AR at 537, 662, 693.  This pain coincided with a reduction in his methadone and Percocet dosages. *Id.* Plaintiff "also noted some fairly prominent tingling in the first 3 digits of the left hand." *Id.* Plaintiff had been wearing a wrist splint at night based upon Dr. Lomas's testing and diagnosis of moderate carpal tunnel syndrome. *Id.*  Plaintiff was prescribed Relafen, 1500 milligrams daily, which had given him some benefit." *Id.* at 537.  The record indicates that Plaintiff was working as an "assistant property manager and does a lot of office work including typing and filing, but also has some minor repair work using his hands." AR at 537.  The record further indicates that Plaintiff's "[h]ips, knees, ankles, and feet all have normal range of motion without pain, effusion, or tenderness." *Id.* at 663, 694.  Dr. Stoesz assessed Plaintiff with "[n]ew onset hand stiffness with trigger fingers and left carpal tunnel syndrome with low positive rheumatoid factor." *Id.*  She further stated that "[c]ertainly these symptoms can represent early rheumatoid arthritis, but this time findings are not diagnostic." *Id.*

On July 28, 2008, Plaintiff's medical records were also reviewed by B. Randal Horton, Psy. D. and a Psychiatric Review Technique completed based upon that review. *Id.* at 554-67.  Dr. Horton stated that Plaintiff "does not allege a mental impairment, but it was noted that on 3441 he stated he was becoming more depressed.  For this reason a [mental status examination,] MSE[,] was scheduled." AR at 566.  Plaintiff, however, did not return the response form and failed to attend his Consultative Examination. *Id.*  As such, Dr.

1  Horton had insufficient evidence upon which to make any findings. *Id.* at 554, 566. On this

2  same date, J.V. Corcoran, M.D. reviewed Dr. Jaradat's April 18, 2008 Physical Residual

3  Functional Capacity Assessment, and affirmed the same. *Id.* at 568.

4      On August 15, 2008, Plaintiff was seen in the emergency room at Community

5  Hospitals Indianapolis for chest pressure. *Id.* at 623-29, 678-81, 684. Plaintiff complained

6  of "heaviness in his chest for 1 week intermittently[,]" worsening that day, and radiating to

7  the left shoulder. AR at 623, 678. Plaintiff was given an EKG, which was normal, and given

8  chewable aspirin and nitroglycerin. *Id.* at 624, 628, 679. The medicines resulted in "some

9  relief of symptoms[,]" after which he was placed on nitroglycerin paste, which resolved his

10  symptoms entirely. *Id.* A chest x-ray indicated a "[n]ormal portable chest[,]" and his ECG

11  showed "[n]ormal sinus rhythm[.]" *Id.* at 709, 712-13. The hospital staff wanted to admit

12  him "to rule out acute cardiac injury" and Plaintiff "refused and stated that he wanted to sign

13  out against medical advice. He stated that he was upset that we had not given him Percocet

14  for his pain." *Id.* at 625, 627, 683. Despite warnings regarding the serious risk to his health,

15  Plaintiff signed out against medical advice. AR at 627-28, 683-84. The records indicate that

16  "[c]ertainly we do not see any indication for Percocet for his diagnosis of chest pain. My

17  suspicion is that he is concerned because his primary reason for being here is a Percocet

18  prescription." *Id.* at 627, 684. On August 19, 2008, Plaintiff was seen by King Gin Yee,

19  M.D. for a cardiovascular consultation. *Id.* at 722-24. Dr. Yee reports that Plaintiff

20  underwent an "exercise echocardiogram[.]" *Id.* at 724. The echocardiogram "demonstrated

21  normal cardiac chamber sizes[.]" *Id.* Further, Plaintiff had "trivial tricuspid regurgitation[,]

22  [and] [w]ith exercise there was no evidence for inducible ischemia[.]" AR at 724.

23  Additionally, "[n]o endocarditis abnormalities were noted[,] [and] [n]o pericardia effusion

24  was identified." *Id.* As a result, Dr. Yee recommended increasing Plaintiff's heartburn

25  medication, because he did not find Plaintiff's recent symptoms to be cardiac in origin. *Id.*

26  at 723-24.

27      On November 20, 2008, Plaintiff was seen by Laura L. Reske, M.D. for an initial

28  - 15 -

interview regarding his anxiety and because his "wife wondering if he is bipolar." *Id.* at 585.
Plaintiff saw Dr. Reske "at the urging of his wife after he became increasingly suspicious of
her over the past 6 mo[nth]s[.]" *Id.*  Plaintiff reported feeling "anxious a lot of time [with]
racing thoughts, worrying, [and] feeling upset." AR at 586.  Plaintiff also reported having
"panic attacks since July, [with] 2 ER visits thinking he was having a [heart attack]." *Id.* at
586, 588.  Plaintiff also admitted a previous suicide attempt after a girlfriend broke up with
him. *Id.* at 586, 588.  On November 21, 2008, Plaintiff completed a patient self-assessment
form at Advanced Pain Management. *Id.* at 574.  Plaintiff reported that his pain stayed the
same when he took his pain medication, and that it reduced his pain level by fifty (50)
percent. *Id.*  Plaintiff did not list any assistive devices, and noted that he is able to dress
himself, do his own shopping and take care of his business one hundred (100) percent of the
time. AR at 574.  Plaintiff reported that he has used home exercise and relaxation techniques
to control his pain. *Id.*  On November 26, 2008, Plaintiff saw Dr. Reske with his wife. *Id.*
at 591.  Dr. Reske assessed an "[a]djustment [disorder] with mixed disturbance of emotions
and conduct, borderline personality features – in crisis again with his wife over his impulsive
actions, boundary violations and lying." *Id.*  Dr. Reske recommended discontinuing
Plaintiff's Xanax, a trial of trazodone 50-150 mg/hs, continuing Celexa 20 mg/d, with a
follow-up appointment in one (1) week. *Id.*

On December 3, 2008, Plaintiff saw Dr. Reske regarding his anxiety.  AR at 592.
Plaintiff discussed his continued unemployment and looking for work. *Id.*  Plaintiff further
indicated "that he has a lot of difficulty falling asleep because when he goes to bed, he starts
to think about all his problems and can't stop." *Id.*  Dr. Reske indicated that Plaintiff was
doing well with the Celexa. *Id.*  Dr. Reske recommended continuing the Celexa 20 mg/d and
adding a trial of Ativan 1-2 mg/hs. *Id.*  Plaintiff was also seen on the same date at the
emergency room of Community Hospitals Indianapolis after being "involved in a motor
vehicle collision on the interstate traveling at a high rate of speed, did slam into the concrete
barrier." AR at 608, 682, 731-32.  Plaintiff "sustained a superficial laceration involving the

right temporoparietal scalp[,] [and] . . . complained primarily of pain in his lower back[.]" *Id.* at 608, 610, 682. Plaintiff "had lumbar spine films obtained, which demonstrate[] potential migration of the pedicle pins in the L4 and L5 screws." *Id.* at 608, 610, 622, 682, 704. On December 5, 2008, Plaintiff filled out a self assessment intake form for a visit with Michael Whitworth, M.D. for back, hip, and knee pain. *Id.* at 573. Plaintiff reported that when he takes his pain medication, his pain level stays the same. AR at 573. Plaintiff reported sleepiness, and that he is somewhat able to do things during the day when he takes his pain medication. *Id.* Plaintiff further reports his pain as between six (6) and ten (10) on a scale of one (1) to ten (10), with ten (10) being the most severe; however, his pain medication decreases his pain level by eighty (80) percent. *Id.* Plaintiff reports using a cane, and using home exercise, relaxation, psychological counseling, and a RS stimulator as methods of pain control. *Id.* Plaintiff indicated that he wished to discuss increasing his pain medication. *Id.* On December 6, 2008, Plaintiff was seen in the emergency room at Community Hospitals Indianapolis. *Id.* at 599-601, 674-75, 688-89. Family member tried to bring Plaintiff in the previous day, but he said he would "sleep it off." AR at 599, 675. The same family member went to check on him, "and he was 'foaming at the mouth' and could not be aroused." *Id.* "[A]n ambulance was called, and [Plaintiff] was transported to the emergency department. *Id.* Plaintiff was assessed with an "overdose of benzodiazepine and opiate pain medication." *Id.* at 600, 674. At the time of admission Plaintiff was found to have been using multiple Fentanyl patches in combination with Lorazepam. *Id.* at 603, 606, 675. The past history also notes that Plaintiff has "a history of felony conviction for driving under the influence of illicit drugs, not alcohol." AR at 603, 606, 718. He also "has a history of cocaine dependence, a history of Oxycodone dependence in the past." *Id.* Plaintiff was "dismissed from Dr. Cole's practice for abuse of his prescription pain medicines postoperatively[.]" *Id.* In addition to polysubstance dependence and overdose, tobacco dependence, and chronic pain syndrome, Plaintiff was diagnosed with aspiration pneumonitis or aspiration pneumonia. *Id.* at 604, 674, 688, 717. On December 6, 2008,

Plaintiff's chest x-ray showed "[p]rominent pulmonary vascularity bilaterally with diffuse right upper and lower lobe infiltrates." *Id.* at 708.  On December 8, 2008, Plaintiff's follow-up x-ray indicated "[n]o significant change in bilateral infiltrates." AR at 707.  Plaintiff was discharged from the hospital on December 9, 2008.  *Id.* at 606.

On December 11, 2008, Plaintiff saw Dr. Reske regarding his "[a]buse of chemicals leading to impairment or concern[.]" *Id.* at 593.  Plaintiff had been recently discharged from the hospital, and admitted to not telling Dr. Reske the extent of his drug history.  *Id.*  Plaintiff was recommended drug treatment while in the hospital, and Dr. Reske concurred.  *Id.*  Plaintiff was hospitalized after putting on two (2) Fentanyl patches "instead of one, and does not remember taking the large amount of other meds including the Ativan."  AR at 593.  Plaintiff "denie[d] that he was trying to harm himself."  *Id.*  On December 12, 2008, Dr. Reske documented her telephone call with Dr. Whitworth.  *Id.* at 594.  She informed Dr. Whitworth of Plaintiff's "long history of substance abuse, including arrest and court ordered drug treatment."  *Id.*  Dr. Reske also "told him that I had recommended that Donald seek an evaluation at Fairbanks for substance abuse[.]" *Id.*  On December 16, 2008, Dr. Reske received an e-mail and page from Plaintiff "requesting a letter by me [to] be faxed to his wife's office so they can take it to court with him this afternoon." AR at 595.  Plaintiff was charged with harassment by his wife's co-worker.  *Id.*  Plaintiff also stated "that he has an appointment with Fairbanks next Tuesday, but was told that he may have to detox from all narcotics and is upset about that possible recommendation." *Id.* at 595.  On December 18, 2008, Plaintiff saw Dr. Reske and discussed his court appearance with her.  *Id.* at 596.  He was "released without having to go to jail, and signed a no contact order." *Id.*  Plaintiff was worried about possible jail time, and also about being fired as a patient from Dr. Whitworth.  AR at 596.  Plaintiff reported having made an appointment at the treatment facility and was worried about detox.  *Id.*

On December 19, 2008, Plaintiff was seen by Dr. Whitworth for low back and rare shooting leg pain.  AR at 569-70.  Dr. Whitworth noted "[p]atient lied to Janet about any

events in the last month denying any problems or hospitalizations . . . he will be withdrawn from drugs due to 'accidental' overdose using 2 duragesic patches plus methadone . . . patient was given duragesic 50mcg patches and told to use these until off and stop methadone, stop duragesic 100mcg, stop dilaudid . . . No further narcotic therapy[.]" *Id.* at 569 (ellipses in original). Dr. Whitworth further noted that on December 12, 2008, he "[r]eceived call from [Plaintiff's] psychiatrist[.] Patient overdosed on duragesic and methadone and nearly died . . . was admitted to hospital . . . used 2 duragesic patches. Was receving [sic] benzos from psychiatrist. Has long hx substance abuse . . . cocaine in the past, spent time in jail for Marijuana?" *Id.* (ellipses in original). Plaintiff's onset history indicates that he had a "[r]ecent lumbar spine surgery Feb 2008 with 3 level lumbar fusion: the back pain has improved significantly and leg pain that was very severe is now virtually gone unless he twists or bends too much." *Id.* Plaintiff further reported that he does not have any referred pain, "only rare[ly] once a day referral into the feet and resolves after 10 min[utes.]" *Id.* Dr. Whitworth's physical exam did not indicate any significant tenderness to palpation. AR at 570. Dr. Whitworth discontinued narcotic therapy and noted that he had an "[e]xtensive discussion [with Plaintiff] re: permanent damage to spine with significant doses   of medication." *Id.* Plaintiff's self assessment on this same date indicated that when taking his pain medication, he is able to do things during the day and that the medication decreases his pain. *Id.* at 572. Plaintiff further reported his daily pain between a six (6) and eight (8) on a scale of one (1) to ten (10), with ten (10) being the worst; however his medication helps to decrease his pain level by sixty (60) percent. *Id.* Plaintiff did not indicate any assistive devices and reported using home exercises and psychological counseling as additional methods of pain control. *Id.* Plaintiff further reported that he feels moderate anxiety, but is never depressed. AR at 572.

On December 22, 2008, Plaintiff e-mailed Dr. Reske stating that he had stopped taking Celexa, and requested a prescription for Neurontin. *Id.* at 597. Dr. Reske directed Plaintiff to speak with either Dr. Whitworth or his primary care physician for a Neurontin

prescription. *Id.* Plaintiff informed her that "he and Dr. Whitworth were 'through.'" *Id.* Dr. Reske provided Plaintiff with the telephone number for a Dr. Arbuck. *Id.* On December 30, 2008, Plaintiff saw by James Caughlin, M.D. for a follow-up. AR at 725-28. Plaintiff needed a refill of his Lisinopril for high blood pressure and "want[ed] to see about pain medication." *Id.* at 725. Plaintiff showed "[n]ormal movement of all extremities[,]" and was not in any "acute distress" and "[n]ot chronically ill." *Id.* at 726. Dr. Caughlin restarted Plaintiff's Neurontin prescription, and gave him a ten (10) day prescription for Vicodin "for any break through pain while titrating neurotin [sic]." *Id.* at 727.

On January 12, 2009, Plaintiff was seen by Dr. Caughlin for medication and to discuss a referral to Meridan Health Group. *Id.* at 719-21. Plaintiff sought a "bridge" with Vicodin until his January 20, 2009 appointment with Meridan for his long term pain management. AR at 719. Dr. Caughlin noted that Plaintiff was "[i]n no acute distress" and "[n]ot chronically ill[,]" and that his musculoskeletal system was "normal" with "[n]ormal movement of all extremities." *Id.* at 720. Dr. Caughlin gave Plaintiff Vicodin until January 20, 2009. *Id.* at 721. On January 20, 2009, Plaintiff was seen by Katina McKain, N.P. and Dmitry Arbuck, M.D. "hoping to find a provider willing to understand pain, help thru [sic] pain medication [managment], pain psychology, and able to provide a support group for my wife and I[.]" *Id.* at 810-18. Physical examination showed Plaintiff was able "to ambulate without any obvious difficulty[,] . . . lean forward to about 75 degrees[,] [l]ateral movements do increase pain especially on the left side[.]" *Id.* at 816. "No abnormal curvature of the spine [was] noted. . . . Straight-leg raises do increase pain[,] [and] [h]e does have full range of motion of all extremities." AR at 816. Plaintiff complained of "bilateral calf numbness with the left being worse when sitting." *Id.* Plaintiff was prescribed Suboxone, Lidoderm patches, and given a prescription for Trazodone for sleep. *Id.* at 817. On January 21, 2009, Plaintiff was seen by NP McKain for his "Suboxone start" appointment. *Id.* at 824. Plaintiff reported that Trazadone made his back hurt and Lidoderm patches "don't work." *Id.* at 825. On January 22, 2009, Plaintiff was seen for a follow-up, and reported that he did not sleep

well, but better.  AR at 827.  Plaintiff reported that the "medication worked well would like to see increase of 4mg to 8mg."  *Id.*  Plaintiff further reported "feeling better, moving better." *Id.* at 828.  On January 27, 2009, Plaintiff was seen for a follow-up regarding the Suboxone treatment.  *Id.* at 829-30.  Plaintiff reported that "Suboxone started out working pretty good not controlling the pain" at current level now.  *Id.* at 830.

On February 18, 2009, Plaintiff was seen by B. Higgins, M.A. for an Initial Biopsychosocial Evaluation.  AR at 833.  Plaintiff denied any prior psychological treatment or legal history.  *Id.*  Plaintiff reported that he was not depressed or anxious.  *Id.* at 835. Plaintiff also indicated a past misuse of prescription drugs.  *Id.*  Plaintiff reported golf, handiman activities, and reading as his hobbies/recreational activities.  *Id.*  Plaintiff's diagnosis included adjustment disorder with mixed depressed mood and anxiety, and opioid dependence.  AR at 837.  On February 19, 2009, Plaintiff was seen for an occupational therapy initial evaluation.  *Id.* at 838-39.  Regarding activities of daily living, Plaintiff was able to perform most activities independently but required significant assistance in lifting, squatting, and gardening, and required minimal assistance or supervision for using a shopping cart carrying grocery bags, and taking out the trash.  *Id.* at 838.  Although Plaintiff reported pain with each activity, it was generally moderate.  *Id.*  On February 23, 2009, Plaintiff was seen regarding is leg and back pain.  *Id.* at 846-47.  Plaintiff reported an increase in pain and trouble sleeping.  AR at 847.  Plaintiff's Suboxone prescription was increased, and his Zanaflex, Restoril and Requip prescriptions refilled.  *Id.*

On March 5, 2009, Plaintiff was seen by Dr. Caughlin for nausea due to medication. *Id.* at 665-67, 714-16.  Plaintiff reported that he had not "taken vicodin [sic] since Jan [sic] 20th and now . . . feel[s] nausea."  *Id.* at 665, 714.  Plaintiff stated "[h]elp me with the medicine and i [sic] want to have you do the maintence [sic] medicine."  *Id.*  Plaintiff further stated "I need to have access to 3-4 vicodin [sic] a day, everyday and i  [sic] will do it however you want."  AR at 665, 714  Dr. Caughlin noted Plaintiff's lower back pain, but stated that he was "[i]n no acute distress" and "[n]ot chronically ill."  *Id.* at 666, 715.  Dr

1    Caughlin informed Plaintiff that he would treat him "for everything else but the pain." *Id.*

2    at 667, 716.  Plaintiff was instructed to return to the pain clinic.  *Id.*  On March 18, 2009,

3    Plaintiff was seen with tenderness in his back.  *Id.* at 848.  Plaintiff reported that the pain in

4    his lower back does not radiate "unless bending to tie shoes." AR at 848.  Plaintiff planning

5    to be seen for an injection evaluation.  *Id.*

6        On April 30, 2009, Plaintiff was seen in the emergency room at Community Hospitals

7    Indianapolis for abdominal pain.  *Id.* at 612-13, 647-52, 676-77, 685-87.  Plaintiff "had

8    previously had an appendectomy[,] . . . [and] [t]here are certainly no signs of inflammation

9    in the area."  *Id.* at 612.  The record indicates that Plaintiff has "a past history of narcotic

10    dependence and he was admitted for an overdose within the last year.  He says he has not had

11    any narcotics in quite some time."  *Id.* at 647, 686.  While in the emergency department,

12    Plaintiff was given Dilaudid and Phenergan. *Id.* at 613, 647, 736.  Plaintiff's abdominal and

13    pelvic CT showed "[n]o evidence of hydronephrosis or stone." AR at 616, 706.  Plaintiff was

14    placed on Protonix and given Lortab for pain.  *Id.* at 612, 615, 649, 676.

15        On September 10, 2009, Plaintiff was seen by Dr. Stoesz for a re-evaluation of joint

16    pain.  *Id.* at 660-61.  Dr. Stoesz noted that Plaintiff's "hips have 20 degrees of internal

17    rotation with slight discomfort mostly on the right side, external rotation of 50 degrees

18    bilaterally, and the left hip has trochanteric tenderness." *Id.* at 661. Further, Dr. Stoesz noted

19    that Plaintiff "has back pain whil lying supine and is more comfortable with the left knee

20    flexed."  *Id.*  "Straight leg raising is positive on the right for left-sided pain and on the left

21    for left-sided pain in the back." AR at 661.  Dr. Stoesz also noted that Plaintiff's "[l]umbar

22    spine has minimal flexion or extension, lateral bending caused some discomfort to the left

23    not to the right."  *Id.*  Plaintiff also had "somewhat of a limp." *Id.*  Dr. Stoesz concluded that

24    there was "[n]o clear evidence of loss of motion in either hip to suggest hip disease; although,

25    he does have trochanteric bursitis on the left, and no evidence of synovitis."  *Id*.  On

26    September 14, 2009, Plaintiff called seeking a referral "to IU pain clinic for back pain." *Id.*

27    at 668.

28                                    - 22 -

On December 8, 2009, Plaintiff received a Lumbosacral spine x-ray. AR at 744. The report indicates that "[p]osterior fusion hardware from L4 through S1 is intact without complicating features." *Id.* There was "disc space narrowing" at L4-L5 and L5-S1, as well as joint space narrowing. *Id.* On December 15, 2009, pursuant to request by the Commissioner, Plaintiff was examined by A. Shahem Kawji, M.D. *Id.* at 746-49. Plaintiff reported using a cane full time, and being able to walk less than a block. *Id.* at 746. Plaintiff further reported that "[h]is low back pain radiates to the left lower extremity with numbness and paresthesias." AR at 746. Dr. Kawji described Plaintiff as "a well-developed adult in no apparent distress." *Id.* at 747. Dr. Kawji further reported that Plaintiff did not have "difficulty getting out of a chair or on and off the examination table." *Id.* Dr. Kawji reported that Plaintiff's "[l]umbar spine ROM forward flexion 60 degrees, extension 5 degrees, lateral flexion full on the right and left." *Id.* at 748. Plaintiff required his cane for this test. *Id.* Dr. Kawji found Plaintiff's "[h]ip ROM flexion limited to 60 degrees right and left, internal rotation limited to 20 degrees, external rotation limited to 30 degrees, extension was full, abduction was limited to 30 degrees and adduction 15 degrees." AR at 748  Plaintiff "had minimal tenderness to palpation on the left side of his lumbar spine and left buttock." *Id.* Plaintiff's "muscle strength [was] 5/5 in the upper and right lower extremities and 3/5 in the left lower extremity." *Id.* Dr. Kawji stated that "[t]he claimant's symptoms have affected their [sic] quality of life and warrant further attention." *Id.*

On January 15, 2010, Richard Wenzler, M.D. completed a Physical Residual Functional Capacity Assessment ("PRFC"). *Id.* at 750-57. Dr. Wenzler found that Plaintiff could occasionally lift ten (10) pounds, and frequently lift less than ten (10) pounds. AR at 751. Dr. Wenzler stated that Plaintiff could stand and/or walk (with normal breaks) for a total of at least two (2) hours in an eight (8) hour workday, and sit (with normal breaks) for a total of about six (6) hours in an eight (8) hour workday. *Id.* Dr. Wenzler determined that Plaintiff was unlimited in his ability to push and/or pull (including operation of hand and/or foot controls). *Id.* Dr. Wenzler stated that Plaintiff could never climb ladders, ropes or

scaffolds, nor could he crawl. *Id.* at 752. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. *Id.* Dr. Wenzler found that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. AR at 753-54. Dr. Wenzler also found the Plaintiff's credibility limited, because the alleged severity of his complaints were "disproportionate and magnified compared to the obj[ective]" medical record evidence in his file. *Id.* at 755.

On January 25, 2010, Plaintiff was evaluated by Bryan London, Ed.D. pursuant to a request by the Commissioner. *Id.* at 758-66. Plaintiff reported that he drove himself to the evaluation site. *Id.* at 758. Plaintiff used a cane, and reported that he could stand or walk for approximately ten (10) to fifteen (15) minutes at a time, and sit for approximately fifteen (15) to thirty (30) minutes. *Id.* Dr. London diagnosed Plaintiff with "Bipolar I Disorder, Most Recent Episode Mixed, Moderate Severity[,] Panic Disorder without Agoraphobia[,] Anxiety Disorder NOS[,] Cocaine Dependence, sustained full remission[,] Cannabis Dependence, sustained full remission[,] [and] Hallucinogen Dependence – LSD, sustained full remission[.]" AR at 765. Dr. London further diagnosed Plaintiff's "report[ed] persistent low back pain with history of three surgeries, claimant report[ed] arthritis pain in hands and knees, GERD." *Id.* at 766. Dr. London further noted Plaintiff's unemployed status, marital discord, and financial concerns. *Id.* During the examination, Plaintiff was able to complete seven digits forward, repeat four digits backwards, and answer mathematical questions. *Id.* at 765. Plaintiff's GAF score was 55 and his prognosis guarded. *Id.* at 766.

On February 1, 2010, Plaintiff was seen by Thomas E. Moran, M.D. for lower back pain and a medication check. AR at 787. Plaintiff reported having spasms in his left leg, and that it hurt while sitting. *Id.* Plaintiff further stated that he has treated the pain with Valium; however that his current dose "does not last long enough." *Id.* Plaintiff's Valium dose was increased. *Id.* Additionally, Plaintiff states that Percocet helps with his daily function. *Id.* Pursuant to a request from the Commissioner, F. Kladder, Ph.D. completed a Psychiatric Review Technique on February 10, 2010. AR at 768-81. Dr. Kladder determined that an

- 24 -

RFC assessment was necessary with coexisting nonmental impairment(s) that required referral to another medical specialty. *Id.* at 768. Dr. Kladder also noted that Plaintiff's diagnosis of affective disorders (Bipolar) and anxiety-related disorders (panic disorder). *Id.* at 768, 771, 773. Dr. Kladder noted that Plaintiff's restriction of activities of daily living and difficulties in maintaining social functioning were moderate. *Id.* at 778. Plaintiff had mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* On this same date, Dr. Kladder also completed a Mental Residual Functional Capacity Assessment. AR at 782-85. Dr. Kladder found Plaintiff not significantly limited in his ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions; and ability to understand and remember detailed instructions. *Id.* at 782. Similarly, Dr. Kladder determined that Plaintiff was not significantly limited in his ability to carry out very short and simple instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and ability to make simple work-related decisions. *Id.* Dr. Kladder reported that Plaintiff was not significantly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 783. Regarding social interaction, Dr. Kladder found Plaintiff moderately limited in his ability to interact appropriately with the general public. *Id.* Plaintiff was otherwise not significantly limited in his ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. AR at 783. Regarding adaptation, Dr. Kladder found Plaintiff not

significantly limited in his ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. *Id.* Dr. Kladder found Plaintiff capable of socializing with people, with good concentration and attention as evidenced by his ability to watch television and play on the computer for extended periods of time. *Id.* at 784. Dr. Kladder further noted some limitations due to physical pain. *Id.*

On March 3, 2010, Plaintiff followed up with Dr. Moran. *Id.* at 786. Plaintiff reported numbness in both legs, and that he was treating the pain with Valium and Percocet. AR at 786. On April 7, 2010, pursuant to request by the Commissioner, J. Gange, Ph.D. "reviewed all the evidence in the file" and affirmed Dr. Kladder's February 10, 2010 assessment. *Id.* at 796. On April 14, 2010, J. Sands, M.D. "reviewed all the evidence in the file" and affirmed Dr. Wenzler's assessment of January 15, 2010. *Id.* at 797.

On June 18, 2010, Plaintiff was "admitted to Community North Psychiatric Pavilion . . . with [a] diagnosis of depressive disorder, and opioid dependence." *Id.* at 856; *see* AR at 851-74, 876-78. Plaintiff had "decided to commit suicide and took an overdose of 20 Ambien pills" in the days prior to admission, as well as tried to strangle himself with a dog leash. AR at 856, 851, 876. Plaintiff was admitted for detox from opioids and sedatives. *Id.* at 858. Plaintiff was diagnosed with depression, not otherwise specified, opioid dependence, benzodiazepine dependence, partner relational problem, chronic back pain, and hypertension. *Id.* at 851, 880-81. On June 23, 2010, Plaintiff was discharged from Community North. *Id.* at 851. On June 28, 2010, Plaintiff was seen at Gallahue Mental Health Services for an initial outpatient assessment, but had no co-pay. *Id.* at 881. "[T]herapist suggested he contact PACE/OAR to get help with payment for services, he stated they are not helpful[.]" AR at 881. Plaintiff also referred him to other facilities that might help with medical insurance. *Id.* The therapist stated that Plaintiff "show[ed] no intent on returning [to] her for services." *Id.* Furthermore, Plaintiff "[u]sed a high-end Droid type

1 of cell phone during most of [the] interview, attitude presented was arrogant, claiming I
2 know what is wrong with me I have a B.S. degree in psychology I don't think I am addicted
3 to anything." *Id.*

4   On August 10, 2010, Plaintiff saw Kalpana Kaapuraala, M.D. to establish care. *Id.*
5 at 890. Plaintiff stated that he has been on Valium and Percocet (taking six (6) per day) for
6 his back pain, and that his blood pressure has improved since he lost sixty (60) pounds. AR
7 at 890. Plaintiff reported his pain as a nine (9) on a scale of zero (0) to ten (10) with ten (10)
8 being the worst possible pain. *Id.* at 893. Plaintiff further reported the pain in his back and
9 left leg. *Id.* Dr. Kaapuraala noted decreased range of motion in his back and tenderness at
10 L4/L5/S1. *Id.* Dr. Kaapuraala refilled his Percocet and Valium. *Id.* at 893-94.

11   On September 8, 2010, Plaintiff saw Dr. Kaapuraala for a follow-up visit and
12 medication refill. AR at 896-99. Plaintiff reported starting a new job at McDonald's, and
13 sought to have his Percocet increased to his previous levels. *Id.* at 896. Rather than increase
14 his Percocet dose, Dr. Kaapuraala prescribed Oxycontin. *Id.* at 898-99.

15   On October 6, 2010, Plaintiff saw Dr. Kaapuraala for a follow-up visit and medication
16 refill. *Id.* at 900-04. Plaintiff reported his pain level as an eight (8) out of ten (10) with ten
17 (10) being the worst possible pain. *Id.* at 902. Dr. Kaapuraala modified his medication list
18 to include Morphine instead of Oxycontin. AR at 902-03. On October 10, 2010 Plaintiff
19 was seen at Continental Reserve Urgent Care stating that someone broke into his house and
20 stole his prescription medication. *Id.* at 886-88. The record indicates his medications as
21 Morphine, Oxycodone, Ambien, Diazepam, and Percocet. *Id.* at 886. The police officer
22 stated that Plaintiff reported his medications missing. *Id.* at 887. Plaintiff was given
23 prescriptions for additional medication and told to follow-up with his primary care physician
24 as soon as possible. *Id*. at 888.

25   On November 5, 2010, Plaintiff saw Dr. Kaapuraala for a follow-up and refill of his
26 medications. AR at 905-08. Plaintiff did not report any changes from the previous visit. *Id.*
27 at 905. Dr. Kaapuraala refilled Plaintiff's medications without change. *Id.* at 907-08.

28

On December 8, 2010, Plaintiff saw Dr. Kaapuraala for a follow-up and refill of his medications. *Id.* at 909-12. Plaintiff did not report any new problems or concerns. *Id.* at 909. Plaintiff reported his pain as a nine (9) out of ten (10), with ten (10) being the worst possible pain. AR at 911. Plaintiff's "preliminary urine drug screen [was] positive for THC and cocaine today[.]" *Id.* Plaintiff denied doing any illicit drugs. *Id.* Dr. Kaapuraala informed him if the test does come back positive she will not prescribe any further refills in his narcotics in the future. *Id.* Dr. Kaapuraala changed his Percocet to Oxycodone and refilled his Valium and Morphine. *Id.* at 911-12.

On February 8, 2011, Plaintiff saw Matthew McConnell, F.N.P. regarding his back pain. *Id.* at 913-15. In light of his substance abuse, Plaintiff was informed that he would have to wait thirty (30) days before consideration for restarting narcotic pain medication. AR at 915. On March 9, 2011, Plaintiff saw N.P. Matthew McConnell for a follow-up visit and medication refill. *Id.* at 923. Plaintiff signed a new pain contract and restarted on narcotic pain medication. *Id.* at 926. Plaintiff's medication list included Lisinopril, Oxycodone-Acetaminophen, MS Contin, and Valium. *Id.* at 927. On March 10, 2011, Plaintiff drug screen was positive for Marijuana. *Id.* at 920.

On Aril 5, 2011, Plaintiff met with a case manager at Marana Health Center Behavioral Services. AR at 930-33. Plaintiff stated that he wanted "[t]o manage issues of Manic Depressive Disorder." *Id.* at 930. Plaintiff further reported that he was divorced from his child's mother. *Id.* Plaintiff was scheduled to attend the Dual Diagnosis Group, the Solutions Group and Health Living Changers Group, as well as one on one therapy. *Id.* at 930-933. A psychiatric evaluation of this same date indicates that Plaintiff reported that his inability to find work was "due to his emotional problems[,]" and that "he lost custody of his daughter due to his mental illness." *Id.* at 938, 943.

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are

1   based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3);

2   *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

3   Commissioner's denial of disability insurance benefits when the ALJ's findings are based

4   on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

5   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

6        Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

7   preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

8   873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is

9   "such relevant evidence as a reasonable mind might accept as adequate to support a

10  conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can

11  support either outcome, the court may not substitute its judgment for that of the ALJ."

12  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992));

13  *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may

14  not focus on an isolated piece of supporting evidence, rather it must consider the entirety of

15  the record weighing both evidence that supports as well as that which detracts from the

16  Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

17

18  **III.   ANALYSIS**

19       The Commissioner follows a five-step sequential evaluation process to assess whether

20  a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows:

21  Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not

22  disabled; step two considers if the claimant has a "severe medically determinable physical

23  or mental impairment[.]" If not, the claimant is not disabled; step three determines whether

24  the claimant's impairments or combination thereof meet or equal an impairment listed in 20

25  C.F.R. Pt. 404, Subpt. P, App. 1. If not, the claimant is not disabled; step four considers the

26  claimant's residual functional capacity and past relevant work. If claimant can still do past

27  relevant work, then he or she is not disabled; step five assesses the claimant's residual

28                                          - 29 -

functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013, and was not engaged in substantial gainful activity since September 30, 2008. AR at 13. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: failed back syndrome with history of back fusion with chronic back pain; lumbar degenerative disk disease; hypertension; trochanteric bursitis; gastroesophageal reflux disease; insomnia; neuropathic pain; sedative dependency; benzodiazepine dependence; opiate dependence; cannabis dependence, bipolar disorder; panic disorder; anxiety disorder; manic depressive disorder; and depression (20 CFR 404.1520(c))." *Id.* at 13-14. At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." *Id.* at 14. The ALJ found that:

> After careful consideration of the entire record, . . . claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: sitting, standing, and walking for thirty minutes at one time each; needs an assistive device when standing or walking; allowing the person to sit or stand alternatively; no operation of foot controls; no climbing ladders, ropes, scaffolds or stairs; occasionally climbing ramps; occasionally balancing and crouching; occasionally stooping, but never repetitively stooping below the waist; no kneeling or crawling; no overhead reaching; avoid all exposure to unprotected heights, dangerous machinery, and slippery and uneven walking surfaces; the work is limited to simple routine and repetitive tasks; the work allows the person to be off tasks for 10% of the day, in addition to regularly scheduled breaks; no interaction with the general public; and only occasional interaction with coworkers.

*Id.* at 16. At step four, the ALJ determined that Plaintiff "is unable to perform any past relevant work (20 CFR 404.1565)." *Id.* at 23. At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))." *Id.* at 24. Thus, the claimant

has not been under a disability, as defined in the Social Security Act[.]" *Id.* at 25.  Plaintiff asserts that the ALJ erred 1) at Step III "in finding that Claimant's medically determinable impairments or combination of impairments did not meet or medically equal the Listings of Impairments at 20 CFR Part 404, Subpart P, Appendix 1[;]" and 2) at Step V "in finding that the vocational expert's [("VE")] testimony and opinion was consistent with the information contained in the Dictionary of Occupational Titles ("DOT")" and relying on the VE's testimony "without explanation for the deviance from the DOT[.]" Pl.'s Opening Brief (Doc. 31) at 18.

### A.    *Step III Listings*

Plaintiff argues that the ALJ erred in finding that Plaintiff's spinal conditions did not meet the listed impairments at 20 C.F.R., pt. 404, subpt. P, app. 1.  Pl.'s Opening Brief (Doc. 31) at 20.  Defendant argues that Plaintiff failed to meet his burden to show that he met or medically equaled the Listing at 1.04A.  Def.'s Opp. to Pl.'s Opening Brief (Doc. 35) at 15.

"The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990) (emphasis in original) (citing 20 C.F.R. § 416.925(a); SSR 83-19).  "[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id.*  Accordingly, "step three streamlines the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 154, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).  "If a claimant suffers from a less severe impairment, the Secretary must determine whether the claimant retains the ability to perform either his former work or some less demanding employment." *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).  "Thus, the listings in several ways are more restrictive than the statutory standard." *Zebley*, 493 U.S. at 533, 110 S.Ct. at 893.  Moreover, "these shortcomings of the listings are remedied at the final, vocational steps

1   of the Secretary's test." *Id.* at 534, 110 S.Ct. at 893.

2        "For a claimant to show that his impairment matches a listing, it must meet *all* of the

3   specified medical criteria." *Zebley*, 493 U.S. at 530, 110 S.Ct. at 891. "An impairment that

4   manifests only some of the criteria, no matter how severely, does not qualify." *Id.* (citing

5   Social Security Ruling ("SSR") 83-19). Section 1.04, 20 C.F.R. pt. 404, subpt. P, app. 1,

6   addresses "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis,

7   spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),

8   resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord."

9   20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04. Section 1.04A 20 C.F.R. pt. 404, subpt. P, app.

10  1, requires "[e]vidence of nerve root compression characterized by neuro-anatomic

11  distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated

12  muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there

13  is involvement of the lower back, positive straight-leg test (sitting and supine)[.]" 20 C.F.R.

14  pt. 404, subpt. P, app. 1 § 1.04A. Additionally, Section 1.04C 20 C.F.R. pt. 404, subpt. P,

15  app. 1, requires "[l]umbar spinal stenosis resulting in pseudoclaudication, established by

16  findings on appropriate medically acceptable imaging, manifested by chronic nonradicular

17  pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."

18  20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04C. The Plaintiff bears the burden of proving that

19  he has an impairment that meets or equals the criteria of an impairment listed in Appendix

20  1 of the regulations. *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

21        Here, the ALJ considered "claimant's failed back syndrome with history of back

22  fusion with chronic back pain and lumbar degenerative disc disease . . . under listing 1.04 for

23  disorders of the back." AR at 14. The ALJ determined that "the objective medical evidence

24  fails to demonstrate the required nerve root or spinal cord compromise for at least a twelve

25  month period." *Id.* (citations omitted). The ALJ further found that "the clinical findings of

26  record fail to establish the required neurological deficits or inability to ambulate

27  effectively[.]" *Id.* (citations omitted). Upon reviewing the record as a whole, this Court

28

concludes that the ALJ's decision is supported by substantial evidence.

The objective medical evidence does not support a finding that Plaintiff can meet all of the elements in the listings as required. *See Zebley*, 493 U.S. at 530, 110 S.Ct. at 891. Moreover, "physical findings must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation[,] . . . and [a]lternative testing methods should be used to verify the abnormal findings; e.g., a seated straight-leg raising test in addition to a supine straight-leg raising test." 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00D. Because Plaintiff cannot meet the strict criteria set forth in the listings nor has Plaintiff presented evidence to establish equivalence, the ALJ's finding that "the evidence fails to demonstrate [Plaintiff's] impairments, considered alone and in combination with all other impairments, meet or medically equal any listing" is affirmed. *See Burch*, 400 F.3d at 683 ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." (citations omitted)).

### B. *Vocational Expert*

"Based on the testimony of the vocational expert, [the ALJ] conclude[d] that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR at 24-25. Plaintiff asserts that the ALJ "erred in accepting the VE testimony without verifying it, as it was inconsistent with the DOT." Pl.'s Opening Br. at 37.

In response to a hypothetical posed by the ALJ, Vocational Expert Ms. Constance Brown opined that, although such an individual could not perform Plaintiff's past relevant work, there was other work in the national economy that such an individual could perform. *Id.* at 83. Such positions would be sedentary and unskilled, and provided example categories such as "general office clerks, the DOT, a sample DOT number which is 209.587-010, . . .

1    [and] bookkeeping and audit clerks, a sample DOT number of which is 219.587-010." *Id.*

2    Additionally, the ALJ asked Ms. Brown whether her opinions were consistent with the DOT,

3    and Ms. Brown confirmed, stating "[i]n so far as the Dictionary covers my testimony, Judge,

4    they are consistent. *Id.* at 85. *See Massachi v. Astrue*, 486 F.3d 1149, 1151-52 (9th Cir.

5    2007) (requiring the ALJ to ask the expert whether her testimony conflicted with the DOT).

6          The "sample DOT numbers" provided correlate to the job of Addressor, which is

7    sedentary and unskilled, and Parimutuel-Ticket Checker, which is also sedentary and

8    unskilled. *See* AR at 83; DOT 209.587-101, 1991 WL 671797; DOT 219.587-010, 1991 WL

9    671989. "Specific Vocational Preparation ("SVP") is defined as the amount of lapsed time

10   required by a typical worker to learn the techniques, acquire the information, and develop the

11   facility needed for average performance in a specific job-worker situation." U.S. Dep't of

12   Labor, *Dictionary of Occupational Titles, Appendix C – Definition Trailer* (1991), 1991 WL

13   688702. An SVP of two corresponds with unskilled work. SSR 00-4p. The sample DOT

14   numbers provided by Ms. Brown are for jobs that fall into the broad occupational classes of

15   jobs represented by general office clerk and bookkeeping/audit clerk, and both have an SVP

16   of 2, which are therefore unskilled. Moreover, the ALJ properly inquired regarding the

17   consistency of Ms. Brown's testimony with the DOT. Accordingly, the Court finds that the

18   ALJ did not err in accepting the VE testimony, and are therefore based upon substantial

19   evidence.

20

21   **IV.    MOTION FOR SUBSTITUTION OF PARTY**

22          Plaintiff filed a Motion for Substitution of Party as an addendum to his Opening Brief

23   (Doc. 31). As an initial matter, it is improper to include a motion for miscellaneous relief as

24   an addendum to the Opening Brief. *See* LRCiv. 16.1 (delineating the contents of an opening

25   brief); *see also* LRCiv. 7.1 (proper form of papers). Counsel is reminded that requests for

26   relief separate from judicial review of the Commissioner's decision should be made in a

27   separately filed motion.

28                                          - 34 -

1       Because the Court has affirmed the decision of the Commissioner, it will deny

2 Plaintiff's motion for substitution as moot.  Plaintiff's motion would be proper, if there were

3 benefits awarded; however, such is not the case here.  *See* 42 U.S.C. § 404(d)(2); 20 C.F.R.

4 § 404.503(b)(2).

5

6 **V.**      **CONCLUSION**

7       In light of the foregoing, the Court affirms the Commissioner's decision.

8

9       Accordingly, IT IS HEREBY ORDERED that:

10      1)      Plaintiff's Opening Brief (Doc. 31) is DENIED;

11      2)      The Commissioner's decision is AFFIRMED; and

12      3)      The Clerk of the Court shall enter judgment, and close its file in this matter.

13

14       DATED this 31st day of March, 2014.

15

16                   _____

17                      Bruce G. Macdonald
                    United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28